IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN BUTLER,**

    **Petitioner,**

  v.                                 **CASE NO. 2:05-cv-786**
                                           **JUDGE HOLSCHUH**
                                           **MAGISTRATE JUDGE KING**

**ERNIE MOORE, Warden,**

    **Respondent.**

**REPORT AND RECOMMENDATION**

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, as amended, respondent's return of writ, petitioner's traverse, petitioner's citation to additional authority, Doc. No. 14, and the exhibits of the parties.

For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**I. FACTS**

This case involves the following facts, as summarized by the Ohio Tenth District Court of Appeals:

> Ms. Davis was found dead in her apartment wearing a pair of long underwear and a long black coat. She was not wearing shoes. Testimony indicated that, during the wintertime, Ms. Davis wore long underwear underneath medical "scrubs" when she worked as a veterinarian assistant at a veterinarian clinic. Testimony also revealed that Ms. Davis likely would not have been dressed as she was if she expected company. The area in which Ms. Davis was found was littered with debris, including broken glass from a curio cabinet.

Injuries to Ms. Davis's hands were consistent with a finding that Ms. Davis struggled with her assailant. There was no sign of forced entry.

Testimony at trial indicated that Ms. Davis was very safety conscious. For example, testimony indicated that Ms. Davis always locked her door and would not unlock and open her apartment door for strangers. Also, according to Timothy Duboe, a friend and former roommate of Ms. Davis, unannounced visitors caused stress to Ms. Davis. Mr. Duboe testified that, when he lived with Ms. Davis, defendant would arrive at their apartment, unannounced. Michelle Wolfe, another former roommate of Ms. Davis, testified that defendant would visit their apartment three or four times per week. When asked whether defendant would "call first and say, 'I'm coming over,' " Ms. Wolfe stated, "No." (Tr. Vol. IV, at 92.)

The prosecution introduced evidence demonstrating that defendant sold the diamond ring that was forcibly removed from Ms. Davis's left hand ring finger to Sebastian Reyna for a fraction of its appraised value. Mr. Reyna testified that defendant approached him, regarding the possible sale and purchase of the diamond ring, on January 4, 1996, a few days after Ms. Davis was murdered. According to Mr. Reyna, defendant offered to sell the ring for three or four hundred dollars. Mr. Reyna had the ring appraised, prior to purchasing it. Mr. Reyna testified that the ring was appraised at around $1,600 or $1,800. Mr. Reyna purchased the ring from defendant for $200, paying defendant in cash and check.

The evidence at trial also indicated that defendant, in early January 1996, had "marks" on his body. Mr. Reyna testified that he observed markings on defendant on their first day back to work after the New Year's day holiday. According to Mr. Reyna, he noticed "scratches, marks" on defendant's shoulder and "upper arm." (Tr. Vol. III, at 402.) There was testimony at trial that defendant said that he obtained the scratches in a bar fight. There was also testimony that defendant said the scratches were from a fight at the gym.

The issue of the length of Ms. Davis's fingernails, as it related to the alleged scratches on defendant's body, was raised at trial. Testimony at trial indicated that investigators requested that the underside of Ms. Davis's fingernails be scraped for possible evidence. Testimony revealed that scraping the underside of her fingernails was not feasible, as they were too short. Also, the parties stipulated that Ms. Davis's best friend, who was a nail technician, would have testified that she had attempted to apply artificial nails on Ms. Davis's fingers

in order to "better present her engagement ring, but Ms. Davis' fingernails were so short that nothing could get under her nails. For that reason, artificial fingernails could not be applied." (Tr. Vol. V, at 61.)

On appeal, defendant contests the significance of the alleged scratches on the body of defendant. Defendant correctly observes that Ms. Davis's fingernails were not scraped for evidence after the homicide because they were too short, and that Ms. Davis's friend was unable to apply artificial nails to Ms. Davis's nails. However, the fact that fingernail scrapings were not collected in this case and the fact that the artificial nails could not be applied by Ms. Davis's friend do not negate the reasonable inference that defendant's scratches or marks on his body, which were observed within days of the homicide, were directly connected to the struggle that occurred in Ms. Davis's apartment that resulted in her brutal murder.

Although Ms. Davis's fingernails may have been too short to be scraped on their undersides and too short to have artificial nails applied to them, she indeed had fingernails at the time of her death. Additionally, we note that there was evidence that the diamond ring was forcibly removed from her left-hand ring finger, which leads to the reasonable inference that Ms. Davis was wearing the ring at the time of the struggle. [FN1] Moreover, the evidence at trial demonstrated that debris, including broken glass from a curio cabinet, littered the apartment after the homicide.

FN1. Carol Davis, the victim's mother, testified that her daughter continued to wear the diamond ring even after her daughter's engagement with Matt Stuller had been broken off. Carol Davis identified a photograph taken Christmas Day 1995 as showing her daughter wearing the diamond ring. Apparently, Ms. Davis continued to wear the engagement ring after breaking up with Mr. Stuller because Mr. Stuller owed Ms. Davis money for clothing that she had purchased for him.

A former co-worker of defendant, Lovell Romans, testified that, in January 1996, defendant, in reference to Ms. Davis's murder, said that he had been out with her that night and dropped her off and he said that he may have been the last one to see her alive. According to Mr. Romans, defendant said that he got the scratches on his body in a bar fight. Tonya Underwood, a co-worker of Ms. Davis at the veterinarian clinic, testified that she last spoke with Ms. Davis over the telephone at 7:45 p.m., on Friday December 29, 1995.

Another former co-worker of defendant, Jim Comwell, testified that defendant told him that he hated Ms. Davis and wished she was dead, and that defendant seemed upset when he made this statement. According to Ms. Wolfe, defendant expressed frustration to her regarding Ms. Davis. In a conversation that occurred a few months before the homicide, defendant told Ms. Wolfe that he was very upset with Ms. Davis for the way she was treating Mr. Stuller and his son. Based on this conversation, Ms. Wolfe viewed defendant as being "very upset with Cheryl. Very upset." (Tr. Vol. IV, at 102.)

Shortly after Ms. Davis was murdered, defendant made suspicious statements, arguably implicating guilt. John Mitchell testified that on the day after Ms. Davis's body was discovered, defendant called him on the telephone. Mr. Mitchell testified regarding this conversation as follows:

[Mr. Mitchell]: He started asking questions about how long fingerprints lasted, how long investigations like this would go on. Just started asking all kinds of weird questions. Wasn't concerned about her, it was more like "me".

Q. When you say "me", you mean Mr. Butler?

A. Yes.

(Tr. Vol. IV, at 34.) Detective James McCoskey, an investigator with the Columbus Police Department, testified that he conducted an interview with defendant in August 1996, and that defendant was not under arrest or in custody at the time of the interview. According to Detective McCoskey, defendant informed him that he had asked about how long fingerprints last because he was aware that Matt Stuller had been interviewed by the police and that these questions were natural questions regarding the investigation of Ms. Davis's murder. (*See* Tr. Vol. V., at 12-13.)

Nissa Ebert testified that defendant told her that he and Mr. Stuller had alibis regarding their possible involvement in Ms. Davis's homicide, specifically telling her that Mr. Stuller was in New York City and that he was at his family's house for the holidays, and he did not leave for four days. When asked whether defendant used the term "alibi," Ms. Ebert stated that he used that term. (Tr. Vol. II, at 217.) Ms. Wolfe learned that Ms. Davis had been murdered when defendant called her on January 1, 1996, between 10 and 10:30 p.m.

4

> According to Ms. Wolfe, after defendant told her that Ms. Davis had been murdered, he told her that he had been informed that Mr. Stuller had been arrested, and he said that Mr. Stuller could not have committed the murder because he was in Washington that weekend.
>
> Mr. Mitchell testified that, in his conversations with defendant in early January 1996, defendant told him about different places he had been on Friday, December 29, 1995. Defendant told Mr. Mitchell that he had gone to UDF to get milk on that Friday. In another conversation, which occurred the next day, defendant told Mr. Mitchell that he had gone to Meijer to return a videotape. Also, according to Mr. Mitchell, defendant told him that he had gotten the scratches on his body during a fight at the gym on that Friday night. According to Mr. Mitchell, "it was always about Friday night." (Tr. Vol. IV, at 69.) Mr. Mitchell testified that defendant said, "the only thing I did" when he referred to where he had been. *Id.* Regarding when the homicide occurred, the parties stipulated that if Dr. Patrick Fardal had been recalled to testify, he would have testified that, to a reasonable degree of medical certainty, Ms. Davis's time of death was 72 to 96 hours before he examined her body on Tuesday morning, January 2, 1996.

Exhibit L to *Return of Writ*.

## II. PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the procedural history and facts of this case as follows:

> This case arises from a homicide that occurred during New Year's weekend, December 29, 1995, to January 1, 1996. On January 1, 1996, Cheryl Davis was found dead in her apartment by her parents.
>
> On April 10, 1998, defendant was indicted by the Franklin County Grand Jury on one count of aggravated murder with a specification and one count of aggravated robbery. The jury convicted defendant on both counts. The trial court sentenced defendant to a 30 years to life prison term for his aggravated murder conviction and a ten to 25 years prison term for his aggravated robbery conviction, to run consecutively. Defendant appealed to this court.
>
> On June 22, 2000, this court reversed the convictions, finding that the trial court erred by admitting into evidence statements defendant

5

made to his wife during an improper custodial interrogation. See *State v. Butler* (June 22, 2000), Franklin App. No. 99AP-302 (*"Butler I"*). This court also concluded that sufficient evidence existed to support defendant's convictions. *See id.*

The trial court conducted a new trial. Defendant was again convicted on both counts, and the trial court sentenced defendant to serve terms of imprisonment of 30 years to life and ten to 25 years, to run consecutively. Defendant again appealed to this court.

On March 28, 2002, this court reversed the convictions, finding statements of the prosecutor, which were made during closing argument, to be improper and prejudicial. *See State v. Butler* (Mar. 28, 2002), Franklin App. No. 01AP-590 (*"Butler II"*). This court determined that the following statements of the prosecutor, made during closing arguments, were improper and prejudicial, warranting reversal of the convictions:

Basically, if I had to sum up this case in just a few words, I can tell you that the defendant cannot explain the unexplainable. He cannot account for it. He cannot dismiss it. He can't even address it. * * *
The defendant cannot account for having this ring. This defendant cannot account for selling this ring. This defendant cannot account for interfering with these witnesses. This defendant cannot account for his multiple versions of where he was that night. He cannot account for the fact that he repeatedly said that he hated an innocent person who had never meant him any harm.

*See Butler II,* quoting the trial transcript. In reaching the above finding, this court determined that the case was similar to *State v. Clark* (1991), 74 Ohio App.3d 151, 598 N.E.2d 740. In *Clark,* the prosecutor, in closing argument, stated as follows: "George [the decedent] can't talk, Clark [the defendant] won't." *Id.* at 156, 598 N.E.2d 740, quoting the trial transcript. The *Clark* court, at 160, found the prosecutor's comment, on the defendant's refusal to testify, improper and prejudicial.

Additionally, this court, in *Butler II,* just as in *Butler I,* found sufficient evidence to support defendant's convictions. The cause was once again remanded to the trial court.

In June 2003, a third trial was commenced. Defendant was again convicted on both counts. The trial court sentenced defendant to life

> without parole eligibility for 30 full years of imprisonment on the aggravated murder count and nine to 25 years of imprisonment on the aggravated robbery count, to be served consecutively.

Exhibit L to *Return of Writ*. Represented by new counsel, petitioner again filed a timely appeal to the Tenth District Court of Appeals. He asserted the following assignments of error:

> 1. The trial court erred in permitting the prosecutor to make an impermissible closing argument which called attention to the fact that John Butler did not testify in his own defense.
>
> 2. The trial court erred in failing to grant a mistrial after a profane outburst from a key prosecution witness.
>
> 3. The trial court erred in admitting records from the United States Bankruptcy Court as evidence against John Butler.
>
> 4. The trial court erred in overruling the Criminal Rule 29 motions presented on John Butler's behalf because the evidence was not sufficient to sustain the convictions.
>
> 5. The verdicts were against the manifest weight of the evidence.

*Id.;* Exhibit I to *Return of Writ*. On February 15, 2005, the appellate court affirmed the judgment of the trial court. Still represented by counsel, petitioner filed a timely appeal of the appellate court's decision to the Ohio Supreme Court. He asserted the following propositions of law:

> 1. It is improper for a prosecutor to comment on a defendant's failure to testify at trial.
>
> 2. Admission of records of bankruptcy proceedings, offered to prove an issue which is not in dispute, is barred by Evidence Rule 403(A).

Exhibit M to *Return of Writ*. On June 29, 2005, the Ohio Supreme Court denied leave to appeal and dismissed the appeal. Exhibit O to *Return of Writ*.

On August 19, 2005, petitioner filed the instant *pro se* petition for a writ of habeas corpus

7

pursuant to 28 U.S.C. §2254. On September 2, 2005, he amended his petition to present the following sole claim for federal habeas corpus review:

> Petitioner's right not to testify and be free from self incrimination as secured by the 5th and 14th Amendments w[as] violated by statements made to the jury by the State prosecutor in closing arguments.

It is the position of the respondent that this claim is without merit.

### III.  MERITS

Petitioner asserts that he was denied a fair trial because, in closing argument, the prosecutor improperly referred to petitioner's failure to testify. The state appellate court rejected this claim as follows:

> [D]efendant argues that the trial court committed reversible error in permitting the prosecutor to draw attention to the fact that defendant did not testify at trial. Defendant specifically points to the following statement of the prosecutor, arguing that it was both improper and prejudicial:
>
> * * * But you know what? As bad as they can make Matt look, the Defendant, in all of his many statements, has never volunteered anything about having this ring. You know that's what the cops are gonna want to talk to him about. They don't want to hear about Matt's birthday or Christmas presents and D.C. and everything. All he has to say is, "I got the ring," and all of a sudden, this investigation will take a completely different tone.
>
> (Tr. Vol. V., at 159-160.) Defense counsel objected to this statement. A conference was held out of the hearing of the jury, and the court stated, "You're getting close, Cowboy," and overruled the objection. (Tr. Vol. V, at 160.) Defense counsel also moved for a mistrial, and the trial court overruled that motion.
>
> Defendant argues that the prosecutor's statement in closing argument "contains a bald-faced lie." (Defendant's merit brief, at 8.) In support

of the proposition that the statement is false, defendant cites to a conversation that he had with Detective Sharon Cecketti. Defendant essentially argues that the prosecutor's statement was improper, in view of a statement that defendant made to Detective Cecketti. We find this argument to be unpersuasive.

In general, prosecutors are given considerable latitude in opening statement and closing argument. *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369. In closing argument, a prosecutor may comment on " 'what the evidence has shown and what reasonable inferences may be drawn therefrom." ' *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773.

In *Butler I,* this court determined that the post-arrest custodial interrogation of defendant by Detective Cecketti was improper. In *Butler I,* this court concluded that defendant's incriminating statements he made to his wife during the improper custodial interrogation should not have been admitted into evidence. During this improper interrogation, defendant apparently told Detective Cecketti that he had removed the engagement ring from Ms. Davis's finger. See *Butler I.* Statements defendant made during this improper interrogation were not admitted into evidence in the third trial.

Testimony regarding various statements defendant made, prior to his arrest, was admitted into evidence in the third trial. However, we observe that there was no evidence admitted in the third trial demonstrating that defendant ever volunteered, in pre-arrest statements, his knowledge regarding the diamond ring. Thus, the prosecutor's statement was consistent with, and limited to, the evidence admitted in the third trial. Moreover, the fact that the prosecutor, when he made the statement in closing argument, may have subjectively known that defendant had made a statement to police regarding the ring, is not significant. The prosecutor properly limited his statement to the evidence admitted at the third trial and any reasonable inferences arising therefrom.

Defendant also argues that the prosecutor's statement "clearly was intended to draw the jury's attention to John Butler's supposed silence with police and his actual silence at trial." (Defendant's merit brief, at 8.) It is improper for a prosecutor to comment on a defendant's failure to testify. *State v. Fears* (1999), 86 Ohio St.3d 329, 336, 715 N.E.2d 136, citing *Griffin v. California* (1965), 380 U.S. 609, 85

9

S.Ct. 1229, 14 L.Ed.2d 106; *State v. Cooper* (1977), 52 Ohio St.2d 163, 173, 370 N.E.2d 725; and *State v. Webb* (1994), 70 Ohio St.3d 325, 328-329, 638 N.E.2d 1023.

The test for prosecutorial misconduct in referring to a defendant's failure to testify is "whether the language used was *manifestly* intended or was of such character that the jury would naturally and *necessarily* take it to be a comment on the failure of the accused to testify." (Emphasis sic.) *Webb,* supra, at 328, 638 N.E.2d 1023, quoting *Knowles v. United States* (C.A.10, 1955), 224 F.2d 168, 170.

Even though, in isolation, the prosecutor's statement appears to refer to defendant's action or inaction in the present tense, or as being ongoing, when it is analyzed in context, we cannot conclude that the prosecutor's statement was an improper comment on defendant's decision not to testify. In the statement at issue, the prosecutor said, "Defendant, in all of his many statements, has never volunteered anything about having this ring." The prosecutor referred to "the cops" as wanting to talk to defendant about the ring. The prosecutor stated that "[a]ll he has to say is, 'I got the ring.' "

The evidence admitted at trial revealed that defendant had made various pre-arrest statements regarding Ms. Davis to police investigators as well as to others. However, in the statements admitted at trial, defendant made no reference to the diamond ring that Ms. Davis had worn prior to her death. We note again that the incriminating statements defendant allegedly made to his wife during the improper custodial interrogation were not admitted into evidence in the third trial. Thus, in effect, the jury had no knowledge that defendant allegedly made incriminating statements to the police, and/or in the presence of the police, during an improper custodial interrogation. Therefore, in the context of all the statements that defendant made that were pre-arrest and admitted into evidence, defendant did not inform anyone that he had been in possession of the diamond ring. Significantly, the state, in its closing argument, made multiple references to the various statements of defendant that were admitted into evidence prior to making the allegedly improper comment.

Although the prosecutor's statement was in the present tense, when viewed in context, we do not view it as an attempt of the prosecutor to focus the jury's attention on defendant's decision not to testify or to be of such character that the jury would naturally and necessarily take it to be a comment on the failure of defendant to testify.

10

> Based on the foregoing, we conclude that the prosecutor did not commit prosecutorial misconduct in closing argument, and we therefore overrule defendant's first assignment of error.

Exhibit L to *Return of Writ*.

The decision of the state appellate court is presumed to be correct:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

> A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the facts before it in an unreasonable manner. *Id.* at 413, 120 S.Ct. 1495.

*Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir. 2005). Petitioner has failed to establish that the state appellate court's decision denying his claim is so unreasonable as to justify federal habeas corpus relief.

11

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow. A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary trial error in cases before it for habeas review. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness. *Id.*, at 642-43; *Martin v. Foltz*, 773 F.2d 711, 716-17 (6th Cir. 1985); *Angel v. Overberg*, 682 F.2d 605, 607 (1982)(*en banc*).

> In analyzing a claim of prosecutorial misconduct, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In order to satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant. *Bates v. Bell,* 402 F.3d 635, 641 (6th Cir.), *cert. denied,*--- U.S. ----, 126 S.Ct. 163, 163 L.Ed.2d 150 (2005).... Once conduct is held to be improper, there are four factors that we consider in determining flagrancy:
>
> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.
>
> *Bates,* 402 F.3d at 641. We must adhere to the harmless error standard in reviewing the state court's determination regarding prosecutorial misconduct. *See id.* ("An error is found to be harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict." ') (quoting *Brecht,* 507 U.S. at 638).

*Broom v. Mitchell*, – F.3d –, 2006 WL 664438 (6th Cir. March 17, 2006).

Petitioner alleges that the prosecutor improperly referred to his right not to incriminate himself.

> The fifth amendment provides that "no person ⋯ shall be compelled in any criminal case to be a witness against himself⋯." It is well settled that direct reference by a prosecutor to a criminal defendant's failure to testify is a violation of the defendant's privilege against compelled self-incrimination. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). When viewing the constitutionality of indirect references by the prosecutor to the defendant's failure to testify, this court must examine four factors:
>
> 1) Were the comments 'manifestly intended' to reflect on the accused's silence *or* of such a character that the jury would 'naturally and necessarily' take them as such;
> 2) were the remarks isolated or extensive;
> 3) was the evidence of guilt otherwise overwhelming;
> 4) what curative instructions were given and when.
>
> *Hearn v. Mintzes,* 708 F.2d 1072, 1077 (6th Cir.1983); *accord Spalla v. Foltz,* 788 F.2d 400, 404 (6th Cir.1986). The court will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible. *United States v. Robinson,* 651 F.2d 1188, 1197 (6th Cir.1981). Whether the jury would "naturally and necessarily" construe the comments to reflect on the defendant's failure.

*Lent v. Wells,* 861 F.2d 972, 975 (6th Cir. 1988).  Upon review of the record, the Court agrees that the prosecutor's statements complained of were neither manifestly intended as a reference to petitioner's failure to testify, nor of such character that the jury would have perceived them as such. *See id; Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003)(No error from prosecutor's statement in closing, "We can't tell you what [the motive] is, because only the man that pulled the trigger knows"); *Lundy v. Campbell*, 888 F.2d 467, 478 (6th Cir. 1989)(No error from prosecutor's comment that "[t]he only story we heard about what happened... came from the State's witnesses"). Additionally, statements complained of were isolated and, for the reasons discussed by the state appellate court, evidence of guilt was substantial.  Further, although no curative instruction was issued, none was requested.  In any event, since the statements at issue would not have been

13

perceived as a direct or indirect comment on petitioner's failure to testify at trial, but rather as a reference to the statements that petitioner did make to police, there is no prejudice from the lack of a curative instruction.

Petitioner argues that this case is analogous to *Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999). *Traverse*, at 3. This Court disagrees. *Paxton* was a federal habeas attack on a state court death penalty conviction. One of the aggravating circumstances charged in that case involved an earlier prosecution of petitioner in connection with the death of his wife. That prosecution had been dismissed after petitioner passed a polygraph test. In the later death penalty prosecution, the parties stipulated that the earlier prosecution had been dismissed. However, the state trial court, citing state law, prohibited all parties from referring to the results of the polygraph test. In closing argument, the prosecutor argued that the defendant

> had the same opportunity to put evidence on that witness stand about that [earlier] killing that we did. Everything--if he had any evidence--if the defense had any evidence to show that that crime didn't happen exactly the way that our witnesses told you it did he could have put a witness on the witness stand. You didn't hear from anybody. ... And there could be a lot of reasons as to why [the earlier prosecution was dismissed]... who knows. We don't know why it was dismissed.

*Id.*, at 1212-1213. In reversing the defendant's death sentence, the Tenth Circuit held:

> [The prosecutor] deliberately made two critical misrepresentations to the jury: he told the jury that Mr. Paxton had been given the opportunity to present any evidence showing that he had not killed his wife, and he told the jury that the reason for the dismissal was unknown. In fact, as Mr. Macy well knew, his objections had prevented Mr. Paxton from presenting evidence that he had passed a polygraph test in connection with the shooting, and that those test results were the reason for the dismissal.

*Id.*, at 1213.

14

> The argument was clearly meant to be understood as inviting the jury to infer that Mr. Paxton had no evidence to rebut the state's assertion that he killed his wife and to speculate at Mr. Paxton's expense on the reasons for dismissal... .
>
> \*\*\*
>
> [T]he misconduct which undisputedly occurred here was an integral part of the deprivation of Mr. Paxton's constitutional rights to present mitigating evidence, to rebut evidence and argument used against him, and to confront and cross-examine the state's witnesses. Because Mr. Macy's remarks infringed upon specific constitutional rights, Mr. Paxton may establish his entitlement to habeas relief without showing that the comments rendered his sentencing fundamentally unfair.

*Id.*, at 1217-1218 (footnote omitted). Here, in contrast, petitioner's pretrial statement as to how he acquired the victim's ring had been suppressed at the request of the petitioner. *State v. Butler,* 2000 WL 796566 (Ohio App. 10 Dist. June 22, 2000). This action, therefore, does not involve material misrepresentations made by the prosecutor regarding exculpatory evidence that petitioner was prohibited from introducing at trial. Rather, the prosecutor's remarks appear to have been aimed -- not at petitioner's failure to testify at trial or refusal to make statements to the police -- but rather at the numerous admissible statements actually made by petitioner to the police and to others and in which petitioner made no mention of his possession of the decedent's ring.

*Ben-Yisrayl v. Davis*, 431 F.3d 1043 (7th Cir. 2005), also referred to by petitioner, likewise fails to support petitioner's claim. In *Ben-Yisrayl v. Davis, supra*, the United States Court of Appeals for the Seventh Circuit granted the petition for a writ of habeas corpus because the prosecutor improperly stated:

> I told you in the opening statement that the Defendant confessed to killing these [two] people with his shotgun. We proved that. We told you that was the cornerstone of our case and why? Because it is self evidence [sic] that no one freely and voluntarily confesses to a

15

> murder unless they're guilty. Let the Defendant tell you why somebody would freely and voluntarily confess …

*Id.,* at 1049. The Court of Appeals concluded that such statement

> was purposeful, directed at Ben-Yisrayl individually, and intended to guide jurors to an impermissible inference under the Fifth Amendment.

*Id.* For the reasons discussed, *supra,* such are not the circumstances here.

In sum, upon review of the entire record, the Court concludes that petitioner simply has failed to establish that the prosecutor's statements were of such an egregious nature, particularly in view of the evidence that was presented, as to deny him a fundamentally fair trial.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation*

*de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


<u>April 17, 2006</u>                                                       <u>    s/Norah McCann King    </u>
                                                                                          Norah McCann King
                                                                              United States Magistrate Judge